**KAMYR, INC., Plaintiff,**

v.

**Jean Marie CLEMENT, Defendant.**

**Civil Action No. 94–2234 (JR).**

United States District Court, District of Columbia.

Jan. 31, 1997.

Robert A. Vanderhye, Nixon & Vanderhye P.C., Arlington, VA, for Plaintiff.

Michael F. Urbanski, William B. Poff, Paul C. Kuhnel, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, for Defendant.

### MEMORANDUM

ROBERTSON, District Judge.

This memorandum sets forth the reasons for the order, issued today, granting the motion of Kamyr, Inc. for summary judgment and declaring that the processes employed in Kamyr-outfitted recycle papers mills in Indiana and West Virginia do not

1

infringe U.S. Patent 4,780,179 (the '179 patent).

## Background

Kamyr, Inc. is a Delaware corporation with its principal place of business in New York. It supplies equipment and engineering services in the pulp and paper field. Kamyr and its parent, A. Ahlstrom Corporation of Finland, manufactured most of the equipment for producing pulp from printed waste paper and designed most of the processes that are the subject of the claims and counterclaims presented in this case.

Jean Marie Clement is a citizen of France and a resident of Italy. He is the owner of the '179 patent, which was issued on October 25, 1988. The '179 patent relates to a method of treating a mixture of printed and contaminated waste paper in order to produce paper pulp.

In letters to Kamyr and in a communication with Kamyr's Indiana customer, Clement charged that Kamyr's equipment for making recycled paper pulp, and the customer's use of that equipment, infringed the '179 patent. Clement threatened both Kamyr and its customer with suit for patent infringement. Kamyr thereupon brought this action for declaratory judgment, denying that it had infringed any of the claims of the '179 patent and asserting that, if the claims of the patent should be interpreted to cover any of Kamyr's equipment, material or activity, then the patent claims are invalid and unenforceable.

The paper recycling system in question is an industrial process by which waste paper is converted to cleaned, recycled pulp. In the Kamyr process, incoming waste paper is moved by conveyer belt to a large drum pulper, then fed in a slurry form through a "deflaker pump," a cleaner, screens, a dewatering process and a pulp press. The mixture is then fed into a bleaching tank, another pulp press and a shredder, another bleach tower, and then a deinking system, a fine screen, centrifugal cleaners, and additional pulp presses, before being delivered at the output end of the line.[1]

The first claim of Clement's patent is to

"a method of treating a mixture of printed and contaminated waste paper in order to produce a pulp for use in the manufacture of paper and paperboards, said waste paper containing non-ink contaminants including stickies...."

The claimed method comprises six steps, set forth at Exhibit 1–12–13, and summarized for purposes of this motion as follows:

*Step A* Forming a first aqueous fibrous suspension at room temperature to form a pumpable slurry and

"to release substantially all of the non-ink contaminants including the stickies from the surface of the paper ... without dispersing such non-ink contaminants as finely divided particles...."

*Step B* Removing non-ink contaminants including stickies [2] by screening and cleaning at room temperature to form a second aqueous fibrous suspension substantially free of the non-ink contaminants including the stickies. *Step C* "Softening the ink vehicles and weakening their binding with the surface of the fibers" by subjecting the slurry to the simultaneous action of high temperature (between 85 degrees and 130 degrees Centigrade), high shear forces, and a de-inking agent. *Step D* Detaching the ink particles by the same process specified in Step C. *Step E* "Limiting the total duration of the ink softening and detaching steps (c) and (d) to a range between 2 and 10 minutes." *Step F* Removing the detached ink particles from the slurry to provide a brightness of at least 59 ISO in the final pulp.

Clement's motion for a summary judgment of literal infringement was all but abandoned at oral argument and must be denied: the temperatures for various steps of the two processes differ (the Clement process uses no added heat at the beginning and high temperatures later, while Kamyr adds heat

1. The two Kamyr–outfitted plants upon which the parties focused their discovery have slightly different processes. The differences are not important to the analysis set forth in this memorandum, however.

2. Stickies are thermo-sensitive contaminants from the pulp which have low melting points, such as binders and plastics.

at the beginning and none later); residence times specified by the two processes are different; the Kamyr process screens and cleans downstream of the disperser, while the Clement process does not; the Kamyr process employs a device called the Frotapulper, which does not accomplish a simultaneous action of high temperature, high shear force and chemical de-inking; and the Kamyr and Clement processes are designed to produce different end products (Clement's process is designed to make pulp with a brightness of at least 59 ISO from relatively low quality waste paper, while Kamyr's is designed to achieve a brightness of 80 ISO from higher quality waste paper).

Clement insists, however, that the Kamyr process infringes by the doctrine of equivalents and demands a jury trial upon the authority of *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512 (Fed. Cir.1995) (*en banc*), *cert. granted*, —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). The argument is that, notwithstanding the differences noted above, the function, way and result of the Kamyr process is essentially the same as that of the '179 patent—temperatures at the initial pulping step low enough that stickies do not melt and mechanical energy gentle enough that they are not dispersed and can be screened out; and then high temperature, mechanical energy and chemical action to soften and remove inks only after substantially all the stickies have been removed. That function, way and result, Clement urges, does not depend on the exact temperature of the initial steps, as long as the temperature is low enough that stickies are not melted. Nor does it require that the "thermo-chemi-mechanical treatment" claimed by the '179 patent be simultaneous, or that heat be added to raise the temperature at this stage of the process, or that the slurry "residence times" fall within the range specified by the '179 patent.

Kamyr's answer to Clement's invocation of the doctrine of equivalents is prosecution history estoppel: Clement is not entitled to expand the literal scope of his claims by claiming equivalents, Kamyr argues, because the prosecution history of the '179 patent demonstrates that the limitations of his claim were necessary to the allowance of the patent.

Clement denies that he is estopped by the prosecution history to claim infringement under the doctrine of equivalents and argues that the claim limitations that emerged from the prosecution of his patent were not required to distinguish his claims from prior art.

The differences between the Clement and Kamyr processes noted above are so fundamental as to raise serious doubt whether a reasonable jury could find them equivalent in function, way, or result. It is not necessary to reach that question, however, if Kamyr's assertion of prosecution history estoppel entitles Kamyr to a summary judgment of noninfringement.

The briefs and oral arguments of the parties have focused the dispute on four factual issues:

1. Whether the temperature of the initial steps of the Kamyr process is the equivalent of the room temperature specified in *Step A* of the '179 patent (and whether Clement is estopped to claim equivalence);

2. Whether Kamyr's removal of most non-ink contaminants ("stickies") at the initial stage of its process is equivalent to the removal of "substantially all" stickies at *Step B* of the '179 patent (and whether Clement is estopped);

3. Whether the Kamyr process uses the equivalent of the ink softening and removal process done in *Steps C and D* of the '179 patent (and whether Clement is estopped); and

4. Whether residence times used in the Kamyr process are equivalent to the 2 to 10 minute range specified in *Step E* of the '179 patent (and whether Clement is estopped).

### Prosecution History

Clement's first claim was file-stamped in the Patent and Trademark Office April 6, 1983. Exhibit 2–5.[3] On March 29, 1985, the Examiner rejected all of the claims as obvi-

---

3. The reference is to Exhibits to Kamyr's Motion for Summary Judgment. Exhibit 2 is the certified file wrapper and contents. The claim is at page 5 of Exhibit 2.

ous over Ortner (U.S. Patent 4,360,402) in view of Raymond (U.S. Patent 3,849,246) and Eriksson (U.S. Patent 3,957,572). On July 9, 1985, Clement amended his claims. Exhibit 2–59. On August 22, 1985, the Examiner again rejected the claims as unpatentable over Ortner, *et al.* in view of Raymond, *et al.* and Eriksson. Exhibit 2–71. Clement then filed a file wrapper continuing application on January 27, 1986 together with preliminary amendments. Exhibit 2–118. The claims were again rejected, on September 11, 1986, as obvious over an article by M.P.H. Burns alone or in view of Eriksson. Exhibits 2–173–182. On January 13, 1987, another amendment was filed. Exhibit 2–183. That amendment was rejected as well, Exhibit 2–194, after which Clement's attorney met with the Examiner. Exhibit 2–209. Additional amendments were then filed. Exhibit 2–223. After the Examiner's final rejection of the claims on April 8, 1987, Clement filed a notice of appeal and an appeal brief. On May 5, 1988, after the appeal was fully briefed, the Examiner and Clement's counsel agreed that, if the claims were amended to be commensurate with the arguments presented in Clement's appeal brief, they would be allowable.

Over the course of this prosecution history, Clement's claims were narrowed significantly.

*Step A.* Clement's initial claim called for early-stage pulping at "low temperature." Exhibit 2–29. In the Examiner's initial rejection, that term (along with others) was rejected as "too relative to be capable of any fixed meaning." Exhibit 2–57. Clement then amended it to "room temperature." Exhibit 2–61. He also changed the cleaning and screening step from "ambient temperature" to "room temperature."[4] The "room temperature" limitation was later added to the screening and cleaning step (Step B). Exhibit 2–224. Kamyr now argues that "room temperature" is a scientific term with a standard meaning and points out that, in the Kamyr process, the temperature at which

the initial pulping, screening and cleaning processes are done is higher than the 20–25 degree Centigrade range normally considered to be room temperature. Clement responds that "room temperature" is not a defined term; that "so long as the temperature is not sufficiently high to melt the stickies, and is lower than the pulp temperature in the MDR disperser, the temperature is not critical;" and that any temperature in the Kamyr process within that range is at least subject to scrutiny by a jury under the doctrine of equivalents.[5]

*Step B.* The "primary reason" for the allowance of the '179 patent was Clement's limitation of his claims to distinguish his process from *Burns:*

"Burns clearly cleans non ink contaminants from his stock after the dispersal unit and flotation as well as before the dispersal unit *whereas applicant cleans only before the disperser,* which is claimed in step (b) via cleaning substantially all the non ink contaminants...." Exhibit 2–276–7 (emphasis added).

It is not disputed that the Kamyr process removes most non-ink contaminants—on the order of 97–98 percent—at the initial stage, but Kamyr insists that removing "most" is not the equivalent of removing "substantially all." Kamyr urges that Clement's limitation to "substantially all" meant "all" and points out that the Kamyr process, unlike Clement's, screens and cleans *downstream* of Step B.

The prosecution history is instructive. Clement's amendment filed July 9, 1985, distinguishes his process from Ortner, pointing out that Ortner separates ink particles by chemical action, a "feeble and short mechanical action," and flotation, while in Clement's process "all the non-fibrous contaminants are separated at room temperature and before the thermo-chemi-mechanical treatment takes place...." Exhibit 2–64–5. An examiner interview summary dated April 17, 1987, records the argument of Clement's representative that Burns "does not eliminate *all* non

---

4. The suggestion was made at oral argument that change from "ambient" to "room" temperature was made because "ambient" is a French word that was not fully understood by the Examiner.

5. Clement did not propose a jury instruction to implement his legal theory that "one must determine whether the temperatures are equivalent from the point of view of a stickie, not a human."

ink contaminants before the ink dispersing step" and his proposal of a claim "limited to removing *all* non ink c[ontaminants] before the disperser step" so that the second aqueous fibrous suspension would be "substantially free of non-ink contaminants...." Exhibits 2–210–11. This change is reflected in handwritten notes on an amendment filed June 29, 1987, Exhibit 2–224, and argued at length in the "remarks" section of the same submission. Exhibits 2–227–9. The "fundamentally different" approach Clement claims is the removal of non-ink contaminants from the pulp before the deinking step, without dispersing them as finely divided particles throughout the first fibrous suspension:

"This is accomplished at relatively low temperatures through the application of mechanical energy. Once the non-ink contaminant are [sic] released from the surface of the fibers, they are removed from the first fibrous suspension substantially free of non-ink contaminants. When the second aqueous fibrous suspension reaches the kneader where the ink contaminants are removed from the pulp, the high temperatures required for this step of the process will not cause any 'stickies' to readhere to the surface of the fibers together with the ink contaminants, because no non-ink contaminants are present."

Again, in Clement's appeal brief filed September 30, 1987:

"The fundamental distinction between the Burns process and the present invention is that in the Burns process both the non-ink contaminants such as binders, hot melts, plastics and other 'stickies' and the ink-based contaminants are removed from the surface of the pulp fibers in the dispersal unit at the same time. In contradistinction, Applicant removes substantially *all* of the non-ink contaminants prior to the removal of the ink-based contaminants in the dispersal unit."

*Steps C and D.* In remarks accompanying his July 9, 1985 amendment, Clement was at pains to distinguish the "thermo-chemi-mechanical treatment" stage of his process from Eriksson, which, he argues,

"does not teach the combined use of high temperature, intense mechanical energy

and chemical action for a short period of time in order to prepare the ... contaminants to be removed. As a matter of fact, the material is simply treated within a kneading apparatus (Frotapulper) and discharged at a final temperature of about 70–90 C, without the use of any chemical dispersing agent. Furthermore, [Eriksson] provides for the application of just one type of energy (mechanical), while the increase of the temperature is only due to the internal mechanical friction...." Exhibit 2–67.

The "thermo-chemi-mechanical treatment" upon which Clement relies to avoid Eriksson (dispersal in a Frotapulper without added heat) is not part of the Kamyr process. Kamyr's processes employ the Frotapulper after pulping, screening and cleaning, without the application of any heat source except the heat generated by mechanical energy, and without the simultaneous application of chemicals.

*Step E.* In his July 9, 1985, amendment, Clement limited his "thermo-chemi-mechanical treatment" to "less than 10 minutes" and recited that "the total duration of the ink releasing and dispersing treatment [was] kept between 2 and 10 minutes." Exhibits 2–61–62. Kamyr asserts, and Clement does not deny, that the limitation of 10 minutes at the upper end of the range was necessary to avoid the Ortner patent. See Exhibits 2–56, 2–61, 2–136. The focus of the parties is at the lower end of the range. At the Kieffer and AMR installations using Kamyr's process, the durations of the step that Clement claims as infringing were measured at 1 minute 23 seconds and 49 seconds, respectively.

### Analysis

■ Whatever the fortunes of the *Hilton Davis* decision in the Supreme Court, it will remain the latest and most authoritative starting point for analysis of a prosecution history estoppel claim, 62 F.3d at 1525:

"Whenever prosecution history estoppel is invoked as a limitation to infringement under the doctrine of equivalents, a close examination must be made as to, not only what was surrendered, but also the reason

for such a surrender." (internal citations and quotes omitted).

In that case, a limitation of "from approximately 6.0 to 9.0" in pH was found to be open to a doctrine of equivalents claim and not estopped by prosecution history because, although the 9.0 pH upper limit had been selected to distinguish the claims in that case from prior art, there was no indication that the 6.0 pH had been argued as a distinguishing feature, or that a pH lower than 6.0 was in the prior art.

■ The application of *Hilton Davis* to the facts of this case is most clearly seen in the dispute over the 2–10 minute time range specified in Clement's Step E. Kamyr asserts that Clement specifically argued the lower limit of 2 minutes in order to distinguish his claims from prior art. That assertion does not find support in the file wrapper citations Kamyr provides for that proposition. Exhibits 2–65, 2–134, 2–136, 2–243. Kamyr goes on to argue, however, that its invitation of file wrapper estoppel on this point has a "coup de grace"—that Clement had to specify 2 minutes as the shortest time for his "thermo-chemi-mechanical treatment" because otherwise his claims would have read on the prior art of Eriksson. That argument cannot be sustained either. The Eriksson patent 3,957,572 claims only a "dwelling time ... shorter than the time necessary for complete impregnation of the paper with water and just sufficient for pumpability...." A residence time of less than 2 minutes does not appear to have been a subject of argument or discussion between Clement and the Examiner.[6] "[A] change that did not in fact determine patentability does not create an estoppel." *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1219 (Fed.Cir.1995); *Laitram Corp. v. NEC Corp.,* 952 F.2d 1357, 1361 (Fed.Cir.1991).

■ Kamyr fares no better with its estoppel argument addressed to Clement's claim that the temperature of Kamyr's initial step is equivalent to that of the '179 patent process. The prosecution history establishes that the Examiner required Clement to use terms more specific than "low temperature," but it does not reflect a requirement by the Examiner or an intent by Clement to specify any particular temperature in order to overcome prior art. "[W]hen claim changes or arguments are made in order to more particularly point out the applicant's invention, the purpose is to impart precision, not to overcome prior art. Such prosecution is not presumed to raise an estoppel...." *Pall Corp.,* 66 F.3d at 1220; *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1285 (Fed.Cir.1986).

■ A prosecution history estoppel does arise, however, with respect to Clement's claim that the Kamyr process infringes the '179 patent by removing most of the non-ink contaminants from the first aqueous fibrous suspension. The allowance of Clement's patent turned on Clement's willingness to limit his claims to specify cleaning of "substantially all" the non-ink contaminants ·at this stage—and none downstream of the disperser. This limitation of Clement's earlier, broader claims, and its importance, was made explicit by the Examiner. Exhibits 2–276–77. "[A] concession made or position taken to establish patentability in view of prior art on which the examiner has relied, is a substantive position on the technology for which a patent is sought, and will generally generate an estoppel." *Pall Corp.,* 66 F.3d at 1220.

The parties have briefed this issue as a contest about the meaning of a few words and phrases: "substantially all," "most," and "all." The correct question is a different one: whether,·in order to avoid the prior art of Burns, Clement surrendered his claim to a process that involved screening and cleaning

---

6. It is true that the '179 patent specifies a precise time range, unlike the pH range in *Hilton Davis,* which had an "approximate" lower limit. Kamyr's argument on this point, however, falls under the rubric of the doctrine of equivalents and not prosecution history estoppel. If Clement were permitted to proceed to trial under the doctrine of equivalents, there might well be a genuine issue of fact with respect to the equivalence of residence times, because Clement argues that Kamyr uses two residence times that should be accumulated for purposes of comparison, or because the actual parameters in use at the Kamyr process plants are disputed, or for both reasons.

**18**

downstream of the disperser. The prosecution history establishes that he did.

The creation of an estoppel is not necessarily fatal to a claim of infringement under the doctrine of equivalents. In *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1363 (Fed.Cir.1983), the Federal Circuit observed that,

> "Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product. It is not fatal to application of the doctrine itself."

In this case Clement's infringement counterclaim attempts "'to reclaim the very thing [he] surrendered by way of amendment,'" *Mannesmann*, 793 F.2d at 1285, and is fatal to his claim that the limitations of Steps A and B of his claim are found in the Kamyr process. Clement cannot prevail on his claim of infringement unless he establishes that *every* limitation of his claim is found in the Kamyr process, either literally or under the doctrine of equivalents, *SmithKline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988); *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985). It follows that Clement's claim of infringement must be dismissed.

### Findings and Conclusions

During the prosecution of the '179 patent, Clement limited his step (b) claim. The claim of removing non-ink contaminants including stickies by screening and cleaning to form a second aqueous fibrous suspension "substantially free" of non-ink contaminants including stickies is construed, in the light of the patent and its prosecution history, to mean that so nearly all of the non-ink contaminants are screened and cleaned from the first aqueous fibrous suspension that no screening and cleaning is done downstream of the disperser. The Kamyr process removes most but not all non-ink contaminants at step (b), and it does screen and clean downstream of the disperser. Clement's surrender of the broader claim during prosecution was critical to the allowance of his pat-

ent and estops his argument that the Kamyr process infringes the '179 patent by the doctrine of equivalents.

### *ORDER*

Upon consideration of plaintiff's motion for summary judgment, it appearing for the reasons set forth in the accompanying memorandum that there are no genuine issues of material fact and that plaintiff is entitled to judgment as a matter of law, it is this 31st day of January, 1997,

**ORDERED** that plaintiff's motion for summary judgment [# 25] is **granted.** It is further

**ORDERED** that defendant's motion for leave to file amended counterclaim [# 34] is **denied.** And it is

**FURTHER ORDERED** that defendant's counterclaim [# 6] is **dismissed.**