ORDER ON CLAIM CONSTRUCTION
 

 GRITZNER, District Judge.
 

 On May 31, 2002, Plaintiff Momentus Golf, Inc. (“Momentus”), filed this patent infringement action against Defendants Swingrite Golf Corporation and J
 
 &
 
 M Golf, Inc. (“Defendants”),
 
 [1]
 
 alleging they were infringing on certain claims of its patent, United States Patent No. 5,582,407 entitled “GOLF SWI-NG TRAINER” (the “ ’407 patent”). Momentus requests both injunctive and monetary relief.
 

 On July 19.2002, Defendants filed answers and counterclaims against Momen-tus. Therein, Defendants request declaratory judgment of noninfringement and ask the Court to find the ’407 patent is invalid and unenforceable.
 

 On December 22, 2003, pursuant to
 
 Markman v. Westview Instruments, Inc.,
 
 52 F.3d 967, 979 (Fed.Cir.1995),
 
 aff'd.,
 
 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), Defendant filed a motion for construction of Claims 1 and 9 of the ’407 patent (Clerk’s No. 58). Therein, Defendants ask the Court to construe the disputed claims in light of the patent’s specifications and prosecution history. Momentus
 
 *MCLXXVIII
 
 resists this motion arguing that the claims speak for themselves and do not need to be construed.
 

 A
 
 Markman
 
 hearing was held on February 25, 2004. Plaintiff Momentus was represented by Lawrence Marcucci; Defendants Swingrite and J & M Golf were represented by Daniel Rosenberg and Daniel Bresnahan.
 

 THE ’407 PATENT
 

 On July 31, 1995, Jim Sorenson (“Soren-son”), president and owner of Momentus Golf (“Momentus”), filed a patent application for a weighted golf-swing training device entitled “Golf Swing Trainer”. Because this ease essentially turns on the application process and prosecution history, the record must be set forth in some detail.
 

 The invention is summarized as follows:
 

 In accordance with the invention, a golf swing trainer is provided which consists of a solid steel shaft homogeneously weighted throughout its entire length. One end of the shaft is fitted with a standard golf club grip and the other end of the shaft is fitted with a rubber tip to afford some protection for walls, floors and furnishings should the golfer elect to use the device indoors. Preferably, the surface of the shaft bears a longitudinal straight line indicia which provides a visual guide to the golfer as a club face reference. The homogeneously weighted shaft so closely positions the center of gravity of the training device to the center of gravity of an actual golf club on a correct swing path as to break down incorrect muscle memory and simultaneously develop the muscle memory appropriate to the correct golf swing.
 

 Typically, the trainer will be in the range of 33 to 36 inches long and 5/8 or 1/2 inch in diameter, the particular length and diameter being chosen to accommodate the size and strength of the golfer. When the golfer has swung the trainer several times, the actual golf club will feel much lighter and easier to swing and unhealthy muscle tension, which is so destructive to a proper swing, will begin to disappear. In addition, the actual golf club will travel along the same path that the trainer followed because the golfer’s muscles will repeat what they have learned in swinging the properly weighted trainer. Having programmed the muscles to repeat the proper motion by use of the trainer, the golfer is able to allow muscle memory to cause a repetition of the proper swing rather than mentally processing the components of the swing as the swing is made, a process most golfers recognize to be a futile exercise leading to disaster.
 

 The application also included an abstract of the disclosure, a background of the invention, a brief description of the diagrams, a detailed description of the invention, ten diagrams, and twelve claims.
 

 On October 31, 1995, the USPTO examiner’s office issued an action letter rejecting Sorenson’s patent application. The letter stated, in pertinent part, as follows:
 

 This application contains claims directed to the following patentably distinct species of the claimed invention:
 

 I. Figs. 1-10 and
 

 II. Fig. 11.
 

 Applicant is required under 35 U.S.C. § 121 to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, no claim is generic.
 

 The drawings are objected to under 37 C.F.R. § 1.83(a). The drawings must show every feature of the invention specified in the claims. Therefore, the
 
 *MCLXXIX
 
 diverse features now claimed but not apparent to the eye from the drawings, e.g., the particular location of “a center of gravity” (claim 1, line 2); the different particular diameters (claims 5 and 6) and lengths (claim 7); and a grip that is fixed “about” the shaft (claim 1, line 1) must be shown or the feature cancelled from the claim. No new matter should be entered.
 

 Claims 1-12 are rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. The number of claims (12) is excessive and confusing for the subject matter, many features claimed are not illustrated on the drawings, the claims are indefinite and unduly broad, and define diverse features that perform no certain function, which obscures that which may be critical in the case. For example, in claim 1, is the “midpoint” a particular location along the length of the shaft, or is it the center of a cross-section of the shaft, i.e. along the longitudinal axis of the shaft? To provide clarity, the particular location must be labeled — c.g.—on the drawings. Claims such as claims 11 and 12 are indefinite in that they refer to “a typical golf club” (claim 11, line 3), and “the golf club” (claim 12, line 5) which are indefinite reference standards. In this art, a typical golf club may be heavily weighted at the grip end, or at the head end, or at neither end. In claim 8, “soft” is indefinite, absent a reference standard. If the claims necessarily require the grip to “encircle” the shaft, such must be thus illustrated on the drawings.
 

 Claims 1-12 are rejected under 35 U.S.C. § 102(a) as anticipated by or, in the alternative, under 35 U.S.C. § 103 as obvious over Wallo. Inherent features of the reference club are claimed. The burden is on applicant to show that inherency is not involved.
 
 Ex parte Gray, 10 USPQ2d 1922.
 
 Any possible distinctions over said club are deemed obvious variations thereof to accommodate the needs of a particular golfer’s size and individual preferences, or to provide particular indicia thereon to identify a manufacture or a particular manner of using the device.
 

 Claims 8 is rejected under 35 U.S.C. § 103 as being unpatentable over Wallo in view of Duran. It would be obvious to cover the tip of Wallo’s club with a soft foam member for protective purposes, which is conventional, and suggested by Duran at 15.
 

 Claims 1-3 and 6 are rejected under 35 U.S.C. § 102(a) as being anticipated by Hawkins et al. See column 7, lines 33^15 for a solid 1/2 inch diameter shaft fitted with a grip. Inherent features of said shaft and grip are claimed.
 

 Claims 1-12 are rejected under 35 U.S.C. § 102(a) as being anticipated by Severin, Thompson et al, and Wheatley. Inherent features of the reference clubs are claimed, as understood.
 

 No claim is allowed.
 

 (emphasis added).
 

 Frank Catalano, Momentus’ patent attorney, responded to the action letter by filing amendments and remarks. Therein, he defended the claims as being distinct from prior art.
 

 The Examiner has rejected claims 1-12 under 35 USC, Section 102 as anticipated by, or under 35 USC, Section 103 as obvious over, Wallo. In Wallo, from 75 to 90% of the weight of the trainer is in the shaft, resulting in from 10 to 25% of the weight being in the head of the trainer (col. 2, lines 18-24). The shaft is hollow (col. 2, lines 25-40). The overall
 
 *MCLXXX
 
 weight of the trainer is such as to require a firmer grip, to strengthen the hands and to slow the swing (col. 2, lines 41-49). The down swing is resisted by the “excessive weight of the club” (col. 2, lines 58-59). The trainer causes “toning and strengthening of the muscles by swinging the excessive weight” (col. 2, lines 69-70). Unlike Wallo, applicant’s trainer has a solid shaft, uses no club head and substantially 100% of the trainer weight is non club head weight. A hollow device having 10-25% club head weight cannot meet the requirement in applicant’s claims that the center of gravity of the trainer be substantially at the center of a solid round stock.
 
 [2]
 
 Catalano made other amendments and submitted amended diagrams including one which established the particular location of the device’s center of gravity.
 
 [3]
 

 On March 6, 1996, a telephonic hearing was held between the patent examiner and Catalano. The examiner proposed several amendments to Claim 1 which Catalano approved. On December 10, 1996, after incorporating the amendments, the examiner issued U.S. Patent No. 5,582,407 to Sorenson’s weighted golf-swing device.
 

 LEGAL STANDARD FOR CLAIM CONSTRUCTION
 

 Claim interpretation is a matter of law exclusively within the province of the Court.
 
 Markman,
 
 52 F.3d at 970-71. Claim construction is the first of the two-step patent infringement analysis.
 
 Liquid Dynamics Corp. v. Vaughan Co., Inc.,
 
 355 F.3d 1361, 1367 (Fed.Cir.2004) (“A determination of patent infringement requires a two-step analysis. The court must first interpret the claim and determine the scope and the meaning of the asserted patent claims, and then compare the properly construed claims to the allegedly infringing device.”) (citing
 
 Vitronics Corp. v. Conceptronic, Inc.,
 
 90 F.3d 1576, 1582 (Fed.Cir.1996)). “[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.”
 
 Id.
 
 (citing
 
 Vitronics,
 
 90 F.3d at 1582).
 

 To begin this process, the Court should “start with the language of the claims and engage in a ‘strong presumption’ that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art.”
 
 Apex Inc. v. Raritan Computer, Inc.,
 
 325 F.3d 1364, 1371 (Fed.Cir.2003). This heavy presumption may be overcome, and a claim term will
 
 not
 
 be given its ordinary meaning if (1) “patentee has acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history”; (2) “the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention”; (3) “the term ‘chosen by the patentee so deprive[s] the claim of clarity’ as to require resort to the other intrinsic evidence for a definite meaning”; and (4) “the patentee phrased the claim in step- or means-plus-function format.”
 
 CCS Fitness, Inc. v. Brunswick Corp.,
 
 288 F.3d 1359, 1367-68 (Fed.Cir.2002) (quoting
 
 Johnson Worldwide
 
 Assocs.,
 
 Inc. v. Zebco
 
 
 *MCLXXXI
 

 Corp.,
 
 175 F.3d 985, 990 (Fed.Cir.1999)). In addition, the district court may consult dictionary definitions to establish the ordinary meaning of claim terms.
 
 Apex Inc.,
 
 325 F.3d at 1371 (citing
 
 Tex. Digital Sys., Inc. v. Telegenix, Inc.,
 
 308 F.3d 1193, 1202 (Fed.Cir.2002)).
 

 “[SJecond, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.”
 
 Vitronics,
 
 90 F.3d at 1582 (citing
 
 Markman,
 
 52 F.3d at 979).
 

 “Third, the court may also consider the prosecution history of the patent, if in evidence.”
 
 Id.
 
 (citing
 
 Markman,
 
 52 F.3d at 979). The prosecution history contains the record of proceedings before the USP-TO, including representations made by the applicant involving the scope of the claims.
 
 Id.
 
 (citing
 
 Markman,
 
 52 F.3d at 979). Those representations are “often of critical significance in determining the meaning of the claims.”
 
 Id.
 
 (citing
 
 Markman,
 
 52 F.3d at 979).
 

 “Arguments and amendments made during the prosecution of a patent application and other aspects of the prosecution history, as well as the specification and other claims, must be examined to determine the meaning of terms in the claims.”
 
 Southwall Tech., Inc. v. Cardinal IG Co.,
 
 54 F.3d 1570, 1576 (Fed.Cir.1995) (citing
 
 E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,
 
 849 F.2d 1430, 1438 (Fed.Cir.1988)). “The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.”
 
 Id.
 
 (citing
 
 ZMI Corp. v. Cardiac Resuscitator Corp.,
 
 844 F.2d 1576, 1580 (Fed.Cir.1988)). An applicant cannot construe a claim one way to obtain approval and another way against alleged infringers.
 
 Id.
 
 (citing
 
 Unique Concepts, Inc. v. Brown,
 
 939 F.2d 1558, 1562 (Fed.Cir.1991)).
 

 ANALYSIS AND DISCUSSION
 

 Throughout the ’407 patent, Momentus emphasized the importance of maintaining the swing trainer’s center of gravity at the midpoint of the shaft. Furthermore, the specifications caution against adding weight to the end of the shaft because it alters the center of gravity. In addition, remarks made during the prosecution of the ’407 patent further demonstrate the central theme of maintaining the center of gravity about the midpoint of the shaft. Specifically, during the prosecution of the ’407 patent, Momentus conceded that the device with a club head having 10-25 percent of its weight at the end of the shaft opposite the grip would fall outside the scope of the trainer.
 

 CLAIM 1
 

 Defendants ask the Court to construe terms in Claim 1 of the ’407 patent. Claim 1, as approved by the USPTO states:
 

 A golf swing trainer consisting essentially of a golf grip fixed about one end of a length of round stock which is solid throughout it [sic] length and cross-section, sold [sic] round stock, said trainer having a center of gravity substantially centered at a midpoint of a longitudinal axis of said length of round stock, and the weight of said round stock being heavier than a typical golf club so that repeated swings of the trainer establishes a muscle memory of the path of the swing, breaking down the incorrect muscle memory and building the correct muscle memory of the path of the swing.
 

 Defendants assert that “consisting essentially of’ precedes a list of structural and functional elements and should be given its well recognized meaning as a “middle ground” transitional phrase. Momentus agrees that the phrase “con
 
 *MCLXXXII
 
 sisting essentially of’ is a transitional phrase, but argues it is a phrase defined by law and needs no construction by the Court.
 

 The transitional phrase “consisting essentially of’ is commonly used to signal a partially open claim in a patent.
 
 PPG Indus. v. Guardian Indus. Corp.,
 
 156 F.3d 1351, 1354 (Fed.Cir.1998).
 

 Typically, ‘consisting essentially of precedes a list of ingredients in a composition claim or a series of steps in a process claim. By using the term ‘consisting essentially of,’ the drafter signals that the invention necessarily includes the listed ingredients and is open to unlisted ingredients that do not materially affect the basic and novel properties of the invention. A ‘consisting essentially of claim occupies a middle ground between closed claims that are written in a ‘consisting of format and fully open claims that are drafted in a ‘comprising’ format.
 

 Id.
 
 (citing
 
 Ex Parte Davis,
 
 80 U.S.P.Q. 448, 449-50 (Pat.& Tr.Office Bd.App.1948); Manual of Patent Examining Procedure § 2111.03 (7th Ed. West 2000) (“The transitional phrase ‘consisting essentially of excluded any element, step, or ingredient not specified in the claim.”)).
 

 In the present case, Claim 1, as submitted in the original application, did not contain the phrase “consisting essentially of’; rather, it contained the term “comprising”.
 

 1. A golf swing trainer
 
 comprising
 
 a golf grip fixed about one end of a length of solid round stock having center of gravity substantially centered at a midpoint thereof.
 

 Catalano’s proposed amended Claim 1 read as follows:
 

 1. A golf swing trainer comprising a golf grip fixed about one end of a length of sold [sic] round stock, said trainer having a center of gravity substantially centered at a midpoint [there]of a longitudinal axis of said stock.
 

 However, the examiner proposed substantial modifications to Claim 1. He replaced the term “comprising” with the phrase “consisting essentially of.” “Sold [sic] round stock” was changed to “round stock which is solid throughout it [sic] length and cross-section.”
 
 [4]
 
 In a telephone interview on March 6, 1996, Catalano consented to the examiner’s amendments.
 

 The examiner unambiguously replaced the “open” transitional
 
 term
 
 — com
 
 prising
 
 — with the “middle ground” transitional
 
 phrase
 
 — consisting
 
 essentially of.
 
 Therefore, the claim includes all listed elements and those unlisted elements that do not materially affect the basic and novel properties of the invention.
 
 PPG Indus.,
 
 156 F.3d at 1354. The “included” elements are a golf grip which (1) is fixed about one end of a length of round stock which is solid throughout its length and cross-section; (2) has a center of gravity substantially centered at a midpoint of a longitudinal axis of said length of round stock; and (3) the weight of said round stock being heavier than a typical golf club.
 

 The trainer, therefore, is open to unlisted elements that do not materially affect its basic and novel properties.
 
 Id.
 
 The novel properties of the trainer, stated in the summary and restated in the descrip
 
 *MCLXXXIII
 
 tions, are a homogeneously weighted shaft with a center of gravity closely positioned to the center of gravity of an actual golf club. These novel properties cause the break down of incorrect muscle memory and simultaneously develop the muscle memory appropriate to the correct golf swing. Therefore, anything added to the trainer which alters those novel features would fall outside the scope of the invention.
 

 During the prosecution of the patent, Momentus made a central concession regarding what fell outside the scope of the invention. The prosecution history must be viewed in light of the fact Momentus was defending
 
 all
 
 claims because its application was rejected in its entirety. Therefore, concessions made during the prosecution must be considered in conjunction and not in isolation.
 

 One reason the application was rejected was because the examiner found the device was anticipated by or made obvious over the Wallo Weighted Practice Golf Club, U.S. Patent No. 3,231,281. To fully grasp what transpired later with regard to defining the ’407 patent, it is necessary to review the details of the prior art. The Wallo patent, issued to Edward Wallo on January 25, 1966, reads, in pertinent part, as follows:
 

 This invention relates to ... a golf club designed specifically for practice swinging only.
 

 [I]t is the principal object of the present invention to provide a practice golf club constructed in such manner as to provide effective and proper toning and strengthening of the body muscles while simultaneously and automatically guiding the body movements into proper coordination.
 

 The overall length of the practice golf club may be varied as desired, it being preferred that the length correspond approximately with the standard length of a long iron or medium wood, for example about 40”. However, it is important that the total weight of the club be from three to five times the weight of a standard golf club in order to derive the proper benefit from its use. The standard medium wood club being approximately 14 ounces in total weight, the practice club of this invention therefore should have a total weight of at least about three pounds and preferably not exceeding five pounds.
 

 Moreover, a substantial proportion of this total weight must be distributed substantially uniformly throughout the length of the shaft, with the remainder contained in the head. The shaft should constitute at least 75%, and preferably about 90%, of the total club weight. This provides the head with sufficient weight for proper feel. This weight distribution distinguishes markedly from the weight distribution in a conventional golf club, wherein approximately 75% of the total weight is concentrated in the head and the remainder in the shaft.
 

 In the event the shaft and head are made of lighter material, such as aluminum piping, the proper weight may be provided by filling the hollow shaft and head with a material of appropriate density, such as sand, lead, synthetic resin, and the like, as indicated at 20 in Fig. 3.
 

 In the use of the practice golf club of the present invention, the conventional stance and grip is taken. Because of the substantially increased weight of the club, a firmer grip is required for controlling the club. This contributes materially to the strengthening of the hands. Further, the excessive weight forces the back swing to be taken much slower
 
 *MCLXXXIV
 
 than normal, thereby tending to correct the common fault of a fast and jerky backswing.
 

 It will be apparent to those skilled in the art that various modifications may be made in the details of construction described hereinbefore. For example, the practice club may be constructed from a conventional golf club by appropriate weighting of the shaft and head so as to provide from three to five pounds total weight with at least 75% of the weight distributed through the shaft. These and other modifications may be made, as desired, without departing from the spirit of this invention and the scope of the appended claim.
 

 Having now described my invention and the manner in which it may be used, what I claim as new and desire to secure by Letters Patent is:
 

 A practice golf club comprising:
 

 (e) the total weight of the practice golf club being from about three to about five pounds, and the shaft thereof constituting about seventy-five to ninety percent of said total weight, the overall length of such club corresponding to that of a standard full swing golf club, ...
 

 (emphasis added).
 

 To save its claim from rejection and to distinguish its device over the Wallo device, Momentus made the following argument:
 

 The Examiner has rejected claims 1-12 under 35 U.S.C., Section 102 as anticipated by, or under 35 U.S.C., Section 103 as obvious over, Wallo. In Wallo, from 75 to 90% of the weight of the trainer is in the shaft, resulting in from 10 to 25% of the weight being in the head of the trainer (col 2, lines 18-24). The shaft is hollow (col 2, lines 25-40). The overall weight of the trainer is such as to require a firmer grip, to strengthen the hands and to slow the swing (col 2, lines 41-49). The down swing is resisted by the “excessive weight of the club” (col. 2, lines 58-59). The trainer causes “toning and strengthening of the muscles by swinging the excessive weight” (col. 2, lines 69-70). Unlike Wallo, applicant’s trainer has a solid shaft, uses no club head and substantially 100% of the trainer weight is non club head weight. A hollow device having 10-25% club head weight cannot meet the requirement in applicant’s claims that the center of gravity of the trainer be substantially at the center of a solid round stock. Furthermore, as explained above, and as set forth in greater detail in claim 11 and in even greater detail in claim 12 of the present application, the claimed weighting of applicant’s device is related to changing the memory and not the strength of the muscles involved in the swing and to changing the path of the swing due to balance rather than changing the speed of the swing due to weight. Applicant therefore submits that applicant’s present invention is neither anticipated by Wallo, which does not disclose the structure claimed by applicant, nor obvious over Wallo, which teaches an entirely different concept of golf swing training and is not applicable to the principles taught by applicant,
 

 (emphasis added).
 

 Defendants assert that the prosecution history shows Momentus conceded that a device having 10-25 percent club head weight cannot meet the requirements of its claims. Momentus denies this assertion stating the Defendants ignore that the statements were made to specifically distinguish its device from a
 
 hollow
 
 device. Momentus further argues the claim was allowed without a percentage limitation and one cannot be read into the claim.
 

 
 *MCLXXXV
 
 Momentus overlooks the fact that the examiner initially rejected Momentus’ application indicating the device was anticipated by or made obvious over the Wallo device
 
 despite
 
 the fact the Wallo device was hollow. That is, taken alone, Momen-tus’ solid shaft design did not distinguish it from the Wallo device because a solid shaft was anticipated by the Wallo patent, which provided, “In the event the shaft and head are made of lighter material, such as aluminum piping, the proper weight may be provided by filling the hollow shaft and head with a material of appropriate density, such as sand, lead, synthetic resin, and the like.” (Wallo Patent) (emphasis added). Moreover, Momentus had to distinguish other features as novel over Wallo, for instance, the weighted shaft which was common to both the Momentus device and the Wallo device.
 

 As the above highlighted language from the prosecution history demonstrates, Momentus defended the novelty of its weighted design by clarifying that Wallo was 75-90 percent shaft weight with 10-25 percent club head weight, whereas, its own device normally had no club head and substantially 100 percent of the trainer weight was non-clubhead weight.
 
 [5]
 
 Momentus distinguished that was the
 
 combined
 
 characteristics of being solid
 
 and
 
 weighted
 
 and
 
 having no club head, which made its device novel over Wallo. Although Momentus suggests that independently each characteristic distinguishes the Momentus device from the Wallo device, that is not what the prosecution history reveals. Rather, the characteristics must be read in conjunction.
 

 The specifications and the prosecution history repeatedly state that the novel feature of the Momentus trainer is the center of gravity which is substantially at the center of the solid round shaft. To save its claim from rejection in view of prior art, Momentus conceded that modifications which altered this defined center of gravity would fall outside the scope of its claimed invention. Momentus cannot now gratuitously deny those concessions in order to broaden the scope of its invention.
 
 Pall Corp. v. Micron Separations, Inc.,
 
 66 F.3d 1211, 1220 (Fed.Cir.1995) (“[A] concession made or position taken to establish patent-ability in view of prior art on which the examiner has relied, is a substantive position on the technology for which a patent is sought, and will generally generate an estoppel.”);
 
 Southwall Tech., Inc.,
 
 54 F.3d at 1576 (“Claims may not be construed one way in order to obtain their allowance and in a different way against accused infring-ers.”).
 

 Therefore, as discussed above, during the prosecution of its claim, Momentus conceded that the center of gravity of a device with a club head weight of 10-25 percent would not be substantially centered at a midpoint of the shaft and therefore cannot meet the requirements of Momentus’ claims.
 
 Schumer v. Lab. Computer Sys., Inc.,
 
 308 F.3d 1304, 1313 (Fed.Cir.2002) (“Thus, the prosecution history limits even clear claim language so as to
 
 *MCLXXXVI
 
 exclude any interpretation that was surrendered during prosecution, but only where the accused infringer can demonstrate that the patentee surrendered that interpretation “ ‘with reasonable clarity and deliberateness.” ’ ”) (quoting
 
 Pall Corp. v. PTI Techs. Inc.,
 
 259 F.3d 1388, 1393 (quoting
 
 N. Telecom Ltd. v. Samsung Elecs. Co.,
 
 215 F.3d 1281, 1294-95 (Fed.Cir.2000)),
 
 vacated on other grounds by PTI Techs., Inc. v. Pall Corp.,
 
 535 U.S. 1109, 122 S.Ct. 2324, 153 L.Ed.2d 152 (2002)). The Court finds on this record the patentee did deliberately and clearly provided the basis for this interpretation.
 

 In construing the phrase “consisting essentially of’ in Claim 1, the Court considers the fact that the examiner insisted on a middle ground transitional phrase rather than an open transitional term. Therefore, the examiner intended that the Claim would be open only to elements which “do not materially affect the basic and novel properties of the invention.”
 
 PPG Indus.,
 
 156 F.3d at 1354. The novel property of the Momentus trainer is that its center of gravity is substantially centered at the midpoint of its solid round shaft, therefore, any element which materially affects this feature would fall outside the scope of the patent. For the reasons stated, the Court must construe the phrase “consisting essentially of’ in Claim 1 as excluding any element, if added to the device would constitute more than 10 percent club head weight, because such an element would materially alter the novel property of the invention.
 

 CLAIM 9
 

 Claim 9 reads, “A trainer according to claim 1 further comprising a golf club head fixed to another end of said length of stock.”
 
 [6]
 

 There is no dispute that Claim 9 is dependent on Claim 1 and includes all the limitations of Claim 1 as well as the limitations of Claim 9. Consequently, the construction of Claim 9 is subordinate to the construction of Claim 1.
 

 Plaintiff argues that Claim 9 clearly anticipates a golf swing trainer with a club head, and therefore a device with a club head would not be outside the scope of Momentus’ patent claims.
 
 [7]
 
 Defendants argue that despite the fact Claim 9 anticipates a club head, in prosecuting the patent, Momentus provided notice as to how much weight a club head, if added to the end of the shaft, would take the device outside the scope of the claims. That is, a golf swing trainer having 10 percent or more club head weight would be outside the scope of the patent claims. Defendants assert that to hold otherwise would run afoul of the “fair notice” function of claiming.
 

 The ’407 specifications clarify the preferred parameters of a club head:
 

 Some golfers have difficulty psychologically in associating their swing trainer swing to their actual golf club swing. To overcome this psychological difficulty, one preferred embodiment of the swing trainer may incorporate a club-head 27 at the end of the shaft 11 as is shown in Fig. 11. However, the addition of the clubhead 27 tends to alter the center of gravity 17 of the trainer in more than a negligible amount. It is therefore desirable that the club-head 27 be kept as light as possible. Furthermore, if a 5/8 or 1/2 inch stock is used for the shaft 11, the clubhead end of the shaft must be adapted to fit a standard 3/8” golf club head connector or, in the alternative, a 3/8 inch stock
 
 *MCLXXXVII
 
 could be used and the grip end of the shaft 11 adapted to accommodate the standard grip 13.
 

 Thus, the club head included in Claim 9 is anticipated to provide only a cosmetic function, with essentially no impact on the center of gravity along the shaft, and no alteration of the novel weighting feature.
 

 The prosecution history also shows that Momentus conceded certain limitations regarding the addition of a club head in defending its claims.
 

 Claims 1, 11 and 12 have been amended so as to clarify that the midpoint is a position along the longitudinal axis of the stock and to further clarify that the relationship of the golf grip to the stock is such that the center of gravity of the trainer is substantially located at the longitudinal midpoint of the stock. Applicant respectfully submits that a structural configuration in which a solid piece of round stock fitted with a golf grip at one end with the components being so interrelated as to result in the center of gravity of the combined arrangement being substantially centered at the longitudinal midpoint of the solid round stock is critical to the operation of applicant’s trainer and is the heart of applicant’s claims. Claims 2 through 7 are specific limitations on this relationship. Specific options include the soft tip of claim 8, the club head of claim 9 and the indicia of claim 10. Claim 11 is intended to further define the relationship of the components of the invention defined in claim 1 in that the weight of the length of stock of the trainer is sufficiently heavier than conventional clubs used in actual play as to result in a new muscle memory related to the golf swing path. That is, and as is stated in some of the references cited by the Examiner, presently known weighted clubs are weighted so as to strengthen the muscles of the golfer and thus enable him to better manipulate or control the path of the swing. Applicant’s device is not based on such manipulated control of the swing due to any increased strength or muscle development in the user, but rather is based on the structural balance of the trainer, that is the center of gravity of the trainer being substantially centered at the longitudinal midpoint of a sold [sic] round stock which is of sufficient weight in relation to the conventional golf club so as to cause the user’s body parts to move in an appropriate golf swing path.
 

 Momentus argues that
 
 substantially centered
 
 does not mean that the center of gravity is exactly at the center of the longitudinal midpoint. Momentus further argues the Defendants are trying to read a limitation into the claim that is not present. The Court disagrees.
 

 Although Claim 9 provides for the addition of a club head on its device, as discussed above, any addition including a club head which alters the novel property of Momentus’ trainer will fall outside the scope of the ’407 patent.
 

 Therefore, consistent with the construction of Claim 1, the Court construes Claim 9 to be limited by Claim 1 in that a club head comprising more than 10 percent of the weight of the device would affect the basic and novel property of the invention being its center of gravity substantially centered about the midpoint of the shaft and would fall outside the scope of the ’407 patent.
 

 CONCLUSION
 

 The Court has construed the disputed claims of the ’407 patent according to the principles delineated by the Federal Circuit. In so doing, the Court used intrinsic evidence to aid in understanding and to ensure consistency in interpreting the patent in issue. The Court hereby construes
 
 *MCLXXXVIII
 
 Claims 1 and 9 of the ’407 patent as detailed herein.
 

 IT IS SO ORDERED.
 

 [1]
 

 . At the
 
 Marhnan
 
 hearing, Plaintiff indicated that it no longer holds a claim against Defendant Grips Fore Golf in this action and it is in the process of filing documentation of that party's dismissal.
 

 [2]
 

 . Catalano also distinguished other prior art; however, inclusion of that discussion is not necessary for construction of claims at issue in the present motion.
 

 [3]
 

 .
 
 Compare
 
 (Def.’s Br., Ex. C at 39 (Figure 1)),
 
 with
 
 (Def.’s Br., Ex. C at 67 (Am. Figure 1)).
 

 [4]
 

 . The examiner also added the following to the end of Claim 1 and eliminated Claims 11 and 12:
 

 length of round stock, and the weight of said round stock being heavier than a typical golf club so that repeated swings of the trainer establishes a muscle memory of the path of the swing, breaking down the incorrect muscle memory and building the correct muscle memory of the path of the swing.
 

 [5]
 

 . Certainly Claim 9 contemplates the additional attachment of a club head at the end of the trainer, but the addition of a club head does not address the issue of added weight and the alteration of the center of gravity along the shaft. The device begins with a homogeneous shaft, for which the center of gravity would be precisely at the midpoint on the shaft. To this is added a light weight grip at one end and normally a protective tip at the other, leaving the center of gravity essentially unchanged. At some point the addition of weight at the distal end of the club would materially alter the essential features of the trainer. In the absence of the prosecution history, specifically defining the point of departure would be an elusive task. In the presence of the prosecution history, however, the specificity is provided by the patent applicant. See following discussion.
 

 [6]
 

 . Claim 9 was not amended from its application form.
 

 [7]
 

 . See footnote 5.